**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA, | ) | |
| STATE OF MONTANA, | ) | |
| STATE OF TEXAS, | ) | |
| STATE OF WYOMING, | ) | |
| | ) | Civil No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES DEPARTMENT OF | ) | |
| INTERIOR; DEBRA ANN HAALAND, in her | ) | |
| official capacity as Secretary of Interior; THE | ) | |
| BUREAU OF LAND MANAGEMENT; | ) | |
| TRACY STONE MANNING, in her official | ) | |
| capacity as the Director of the Bureau of Land | ) | |
| Management; and SONYA GERMANN, in her | ) | |
| official capacity as the Director of the Montana- | ) | |
| Dakotas Bureau of Land Management | ) | |
| | | |
| Defendants. | | |

---

**COMPLAINT FOR REVIEW OF FINAL AGENCY ACTION**

---

The States of North Dakota, Wyoming, Montana, and Texas ("Plaintiff States") hereby petition the Court for review of a final rule promulgated by the United States Department of Interior through the Bureau of Land Management ("BLM"), entitled "Waste Prevention, Production Subject to Royalties, and Resource Conservation."  89 Fed. Reg. 25,738 (Apr. 10, 2024) ("Final Rule").  A copy of the Final Rule is included with this Complaint as Attachment A.

## INTRODUCTION

1.       This Final Rule is BLM's second attempt to play the role of the Environmental Protection Agency ("EPA") and use statutory authority given to the agency for the purpose of preventing the waste of federally owned oil and gas to promulgate sweeping greenhouse gas emission controls for putative climate change purposes.  This Final Rule is also BLM's second attempt to use its authority over federally owned oil and gas as a basis to expand its power and subject vast amounts of State-owned and privately-owned oil and gas to federal regulation.

2.       A Federal Court already rejected BLM's first attempt to accomplish both of these ends and vacated the first variation of this Rule.  *See Wyoming, et al. v. U.S. Dep't of Interior*, 493 F.Supp.3d 1046 (D. Wyo., 2020), *appeal filed* (10th Cir. No. 20-8073).  Other than being less careless with its language this time, very little has been done to change the Rule since the last time it was vacated, and none of the key legal infirmities have been fixed.  If anything, this variation of the Rule is brazenly more unlawful than the one previously vacated.

3.       While BLM's most recent attempt to promulgate a climate-change related rule using statutory authority given to it for an entirely different purpose is unfortunate, it is not surprising.  Recent events have seen many federal agencies heeding the call of Executive Order 13990, which directed all agencies to "immediately commence work to confront the climate crisis."  86 Fed. Red. 7037 (Jan. 20, 2021).  Federal agency after federal agency has taken it upon themselves to play the role of EPA and contort their rulemaking authorities to promulgate climate-related rules outside their wheelhouse and without statutory mooring, requiring States to challenge rule after rule in courts.  *See, e.g., Kentucky v. Fed. Highway Admin.*, ---F.Supp.3d---, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024) (invalidating Department of Transportation climate rule purporting to mandate States set declining on-road CO2 emission targets for lacking any statutory

basis and being arbitrary and capricious); *Iowa v. Sec. and Exchange Comm'n*, No. 24-1522, Entry 537990 (8th Cir. Apr. 3, 2024) (challenging SEC rule requiring public companies to make climate-related disclosures as lacking any statutory basis); *Louisiana v. Biden*, No. 2:24-cv-406, Dkt. 1 (W.D. La. Mar. 21, 2024) (challenging Department of Energy's unilateral "pause" on liquified natural gas exports for climate-related reasons as clearly contrary to statute); *see also North Dakota v. Dep't of Interior*, No. 1:21-cv-00148, Dkt. 98 (D.N.D. Mar. 27, 2023) (enjoining BLM's refusal to hold statutorily mandated oil and gas lease sales for climate-related reasons).

4.      This Final Rule is more of the same.  This Rule is an unlawful attempt by the BLM to impose significant greenhouse gas emission restrictions using regulatory authority given to the agency for preventing the waste of federally owned oil and gas, displacing the comprehensive regulatory framework for air emissions created by the Clean Air Act's cooperative federalism framework.  BLM also attempts to expand the Final Rule's reach by unlawfully asserting federal regulatory authority over oil and gas that is owned by the States and private parties.  And if all that wasn't enough to vacate this Rule again, the Rule should be vacated as arbitrary and capricious for multiple reasons, including that BLM's flawed cost-benefit analysis fails to meaningfully account for the fact that many operators will need to decrease or cease production in order to comply with the Rule.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this Complaint under 28 U.S.C. § 1331 because the claims presented arise under federal law, and under 5 U.S.C. §§ 702 and 706 which waive the United States' sovereign immunity.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because Plaintiff State of North Dakota resides within the District of North Dakota and because property subject to the action is situated in the District of North Dakota.

## PARTIES

7.      Plaintiff State of North Dakota is a sovereign State of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens to manage the development of natural resources in the State, including oil and gas exploration and production. North Dakota obtains a large share of its tax revenue directly and indirectly from oil and gas development and also receives royalties from the development of State-owned minerals.  Drew Wrigley is the Attorney General of North Dakota and is authorized to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state."  N.D.C.C. § 54-12-01(2).

8.      Plaintiff State of Montana is a sovereign State of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens to manage the development of natural resources in the State, including oil and gas exploration and production.  Montana obtains a large share of its tax revenue directly and indirectly from oil and gas development and also receives royalties from the development of State-owned minerals.  Montana brings this suit through its Attorney General, Austin Knudsen.  He is the chief legal officer of the State of Montana and has the authority to represent the State in federal court.  Mont. Const. art. VI, §4(4); Mont. Code Ann. § 2-15-501(1).

9.      Plaintiff State of Texas is a sovereign State of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens to manage the development of natural resources in the State, including oil and gas exploration and production.  Ken Paxton is

the Attorney General of Texas.  Attorney General Paxton represents Texas in civil litigation and is Texas's chief legal officer.  *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2001).

10.     Plaintiff State of Wyoming is a sovereign State of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens to manage the development of natural resources in the State, including oil and gas exploration and production.  Bridget Hill is the Attorney General of Wyoming and is authorized to "[r]epresent the state in suits, actions or claims in which the state is interested in either the Wyoming Supreme Court or any United States court."  Wyo. Stat. Ann. § 9-1-603(a)(iv).

11.     Defendant United States Department of Interior is an Executive Branch agency that administers land and mineral estates owned by the Federal Government in Plaintiff States, and in North Dakota specifically.

12.     Defendant Secretary Debra Haaland is Secretary of the United States Department of the Interior and is sued in her official capacity.

13.     Defendant BLM is a sub-component of the United States Department of the Interior. BLM is the custodian of the federal mineral estate and is responsible for the administration and management of oil and gas development on federal lands.

14.     Defendant Tracy Stone Manning is Director of the Bureau of Land Management and is sued in her official capacity.

15.     Defendant Sonya Germann is Director of the Montana-Dakotas Bureau of Land Management and is sued in her official capacity.

## FEDERAL STATUTORY FRAMEWORK

### A.     Mineral Leasing Act

16.     The Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. § 180 *et seq*., created a program for leasing mineral deposits on federally owned lands.  The purpose of MLA is to "promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise, and to obtain for the public reasonable financial returns on assets belonging to the public."  *Wyoming,* 493 F.Supp.3d at 1062 (internal citations omitted); *see also Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984) (The "broad purpose of the MLA was to provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while assuring through competitive bidding adequate compensation to the government for leasing in producing areas").

17.     The MLA grants Defendants the authority to promulgate regulations to further the purposes of the MLA, to include requiring that lessees of federal or Indian mineral interests "use all reasonable precautions to prevent waste of oil or gas developed in the land."  30 U.S.C. § 225.

### B.     Federal Oil and Gas Royalty Management Act

18.     The Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. § 1751 *et seq*., established a system for collecting federal mineral royalties, including the payment of royalties for " oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order or citation issued under this chapter or any mineral leasing law." 30 U.S.C. § 1756.  FOGRMA also authorized Defendants to promulgate regulations to effectuate the purposes of the statute.

6

19.     Read together, the MLA and FOGRMA "make clear that Congress intended the Secretary [of the Interior], through the BLM, to exercise rulemaking authority to prevent the waste of Federal and Indian mineral resources and to ensure the proper payment of royalties to Federal, State, and Tribal governments." *Wyoming*, 493 F.Supp.3d at 1063.

**C.     Clean Air Act**

20.     Through the Clean Air Act, enacted in 1970, Congress established a comprehensive framework for regulating air emissions under the auspices of the EPA.

21.     The Clean Air Act made the States and EPA "partners in the struggle against air pollution." *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). The Clean Air Act contains several programs under which EPA sets standards for emissions from "stationary sources" (i.e., sources that do not move), such as for the concentration of certain pollutants in ambient air, which are then implemented and enforced by the States through State Implementation Plans ("SIPs") that are approved by EPA. *See generally* 42 U.S.C. § 7410.

22.     In this "experiment in cooperative federalism," *Michigan v. E.P.A.*, 268 F.3d 1075, 1083 (D.C. Cir. 2001), the Clean Air Act establishes that improvement of the nation's air quality will be pursued "through state and federal regulation," *BCCA Appeal Group v. E.P.A.*, 355 F.3d 817, 821-22 (5th Cir. 2003); *see also* 42 U.S.C. § 7401(a)(3) ("air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments"); 42 U.S.C. § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State. . . .").

23.     Under the Clean Air Act, EPA has promulgated comprehensive emission standards for both new and existing oil and gas activities, which are implemented by the States through their EPA-approved SIPs. 42 U.S.C. § 7410. This includes BLM's recently promulgated *Standards of*

*Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Gas Natural Gas Sector Climate Review*, 89 Fed. Reg. 16,820 (Mar. 8, 2024) which purports to regulates methane and other greenhouse gas emissions from new and existing sources of oil and gas production.

**D.      Federal Land Policy and Management Act**

24.      BLM's management of public lands is also governed by the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 *et seq*.

25.      "At its core, FLPMA is a land use planning statute." *Wyoming*, 493 F.Supp.3d at 1063 n.16; *see also* 43 U.S.C. § 1712(a) ("The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans…").

26.      BLM manages the use of federal oil and gas resources through a three-phase decision-making process. First, BLM establishes a resource management plan for a region, such as a State, which is itself involved the extensive planning process.  Second, BLM conducts lease sales under the MLA.  Third, BLM considers applications for permission to drill.

27.      The main land use plan that BLM uses to implement this process is the "resource management plan," which is a public and binding document issued through the public notice and comment process.  *See* 43 CFR § 1601.0-5(k).  "All future resource management authorizations and actions, as well as budget or other action proposals to higher levels in the Bureau of Land Management and Department, and subsequent more detailed or specific planning, shall conform to the approved plan."  43 C.F.R. §§ 1610.5-3(a).

28.     "The resource management plans establish which areas within the Field Office's boundaries are open to oil and gas leasing and which areas are closed." *W. Energy All. v. Jewell*, 2017 WL 3600740, at *2, No. 1:16-CV-00912-WJ-KBM (D.N.M. Jan. 13, 2017).

29.     Unless and until amended through a formal planning process, the resource management plan is binding on the BLM. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004) ("The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan.").

**STATE STATUTORY FRAMEWORKS**

**A.     State Regulation of Oil and Gas Interests**

30.     The North Dakota Legislature has declared it to be in the State's interest "to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas be had and that the correlative rights of all owners be fully protected; and to encourage and to authorize cycling, recycling, pressure maintenance, and secondary recovery operations in order that the greatest possible economic recovery of oil and gas be obtained within the state to the end that the landowners, the royalty owners, the producers, and the general public realize and enjoy the greatest possible good from these vital natural resources."  N.D. Cent. Code § 38-08-01.  To further that interest, North Dakota implements its own stringent venting and flaring restrictions for oil and gas production operators.  S*ee* N.D. Cent. Code § 38-08-06.4.  And North Dakota's operative resource management plan, North Dakota Resource Management Plan and Environmental Impact Statement (July 1987), provides: "[i]n all cases, the stipulations prescribed

9

for federal mineral development in split-estate situations apply only to the development of the federal minerals." *See* Attachment B at 100[1]; *see also id.* at 164 ("In the case of split estate the stipulations do no dictate surface management on private lands but are only intended to provide required protection of important resources that otherwise may be impacted by federal actions.")

31.     The Montana Legislature, "mindful of its constitutional obligations under Article II, section 3, and Article IX of the Montana constitution, has enacted the Clean Air Act of Montana." Mont. Code. Ann. § 75-2-102(1).  The Montana Legislature has declared that it is "the public policy of the state to achieve and maintain levels of air quality that will protect human health and safety and, to the greatest degree practicable, prevent injury to plant and animal life and property, foster the comfort and convenience of the people, promote the economic and social development of this state, and facilitate the enjoyment of the natural attractions of this state." Id. §102(2).  And that policy "must be balanced by the legislature with the policy of protecting the ability of the people to pursue life's basic necessities and to acquire property and to use that property in all lawful ways." *Id.*  To further those interests, Montana implements its own stringent venting and flaring restrictions for natural gas. *See* Mont. Admin. R. 17.8.1603; Mont. Admin. R. 17.8.1711; Mont. Admin. R. 36.22.1220; Mont. Admin. R. 36.22.1221.  The Montana Board of Oil and Gas Conservation (MBOGC) administers the state's oil and gas conservation laws, promotes conservation, prevents waste in the recovery of resources, and regulates oil and gas exploration and production.  *See* Mont. Code. Ann. § 82-11-124.  MBOGC staff monitor conservation regulations at oil and gas operations throughout Montana.

---

[1] Pagination references for Attachment B refer to the labelled page numbers in the North Dakota Resource Management Plan and Environmental Impact Statement

32.     The Texas Railroad Commission (RRC) regulates the exploration, production, and transportation of oil and gas in Texas.   RRC oversees all oil and gas wells in Texas, as well as those that own wells or engage in drilling. TEX. NAT. RES. CODE § 81.051.  RRC (1) prevents the waste of natural resources, (2) protects the rights of different interest owners, (3) prevents pollution, and (4) provides safety. It accomplishes these goals through permitting and reporting requirements; field inspections, testing programs and monitoring activities; and through remedial programs regarding abandoned wells and sites. RRC also administers Texas's oil and gas regulations, found at 16 TEX. ADMIN. CODE §§ 3.1–3.107.

33.     The Wyoming Oil and Gas Conservation Act established the Wyoming Oil and Gas Conservation Commission (WOGCC) for the purposes of regulating oil and gas activity in Wyoming.  *See* Wyo. Ann. Stat. § 30-5-104.  The WOGCC is charged with preventing waste of oil and gas resources and protecting correlative rights. *See id.*; *see also* Wyo. Stat. Ann. § 30-5-102.  The WOGCC has promulgated Rules that prevent waste, provide for the communitization of development, and protect correlative rights.  The WOGCC Rules also protect public health and the environment.  Specifically, Chapter 3, Section 9 of the WOGCC Rules provides authorization for venting and flaring, encourages operators to employ practical technologies that minimize venting and flaring, and requires that all venting and flaring be conducted in compliance with State air quality rules.

**B.     State Pooling of State, Private, and Federal Mineral Interests**

34.     Several Plaintiff States manage oil and gas development in their State with regulatory structures that involve the pooling (or "communitization") of mineral interests held by private parties, the State, and/or the federal government.

35.     In North Dakota, for example, oil and gas development is generally managed in terms of "spacing units," which are typically 1280 acres in size (one mile by two).  To promote and coordinate the efficient and fair development of natural resources and avoid waste, North Dakota authorizes (and frequently requires) the pooling or unitization of different mineral interests within spacing units.  *See*, N.D. Cent. Code § 38-08-08.  North Dakota law establishes rules by which the various mineral interests involved in pooling arrangements enter into "communitization agreements" to share both the costs and benefits of developing the pooled or unitized oil and gas interests.  *See*, N.D. Cent. Code § 38-08.  For historical reasons, communitization agreements in North Dakota frequently include State, private and federal interests.  Federal mineral interests are present in over 30% of the spacing units in the State, creating a checkerboard of lands with private or state surface ownership and a mix of federal, state, and private mineral ownership. As a consequence, virtually all federal oil and gas interests in North Dakota are pooled with State or private interests in some form of split estate.

36.     When Texas joined the Union in 1845, it did not relinquish control of its public lands. Consequently, all federal lands in Texas were acquired by purchase or donation, resulting in a significant number of split estate properties.  Nearly 3 million acres of federal land are located in Texas, and many of those federal lands overlay oil and gas formations—mineral interests held by Texas and private citizens.  Those mineral interests, and oil and gas produced therefrom, are subject to regulation by the Texas Railroad Commission.

37.     In Montana, the surface and mineral estates are intermingled between fee, state, and federal ownership.  BLM and the State of Montana are large land and mineral owners, but many minerals are owned privately. Among federal, state, and private ownership of either the surface or mineral estate, there could be any combination of ownership—sometimes creating a checkerboard

of lands with private or state surface ownership and a mix of federal, state, and private mineral ownership. Montana law establishes rules by which the various mineral interests enter into "pooling agreements" to share both the costs and benefits of developing the pooled or unitized oil and gas interests. Mont. Code. Ann. § 82-11-202.

38.     And in Wyoming, the surface and mineral estates are also intermingled between fee, state, and federal ownership. Approximately 42 million acres of federal mineral estate exist in Wyoming.

39.     When a pooled spacing unit under State law includes federal mineral interests (as is frequently the case in Plaintiff States), the MLA allows lessees of federal minerals to conform to State spacing unit and pooling rules through communitization agreements, subject to BLM approval. 30 U.S.C. § 226(m); 43 CFR § 3105; BLM Manual 3160-9.06. BLM has promulgated regulatory requirements for communitization agreements that cover the entire spacing unit, not just the federal mineral interests in the communitized spacing unit. *See*, 43 CFR 3105, 25 CFR Parts 211 and 212, BLM Manual 3160-9. Thus, exploration and production activities that take place solely on the State or private portions of the communitized spacing unit are subject to the BLM development rules.

40.     However, BLM's authority to regulate non-federal mineral interests through communitization agreements is limited to that degree necessary to protect those federal interests—such as rates of development and production—for purposes of avoiding the waste of Federal mineral interests, similar to the rights of any participant in communitized arrangements. *Wyoming*, 493 F.Supp.3d at 1082. For four decades, BLM consistently understood and acknowledged that its ability to enter communitization agreements with State and private mineral interests did not grant BLM general regulatory authority over those State and private mineral interests.

13

### C. State Regulation of Air Quality

41. The North Dakota Department of Environmental Quality has jurisdiction to administer North Dakota's comprehensive air-quality programs, which have been developed in the cooperative federalism framework of the Clean Air Act, largely through North Dakota's EPA-approved SIP.  North Dakota's comprehensive air quality programs include the regulation of methane emissions from oil and gas operations.

42. The Montana Department of Environmental Quality (MDEQ) administers its major environmental protection laws, including Montana's comprehensive air-quality programs which have been developed in the cooperative federalism framework of the Clean Air Act, largely through Montana's EPA-approved SIP.  *See* Mont. Code. Ann. § 75-2-112.

43. The Texas Commission on Environmental Quality administers Texas's comprehensive and robust air-quality programs, including the Texas Clean Air Act (TEX. HEALTH & SAFETY CODE § 382.055, 30 TEX. ADMIN. CODE 101.1 et seq.) and CAA programs.  Texas's comprehensive air quality programs include the regulation of methane emissions from oil and gas operations.

44. The State of Wyoming has an EPA-approved SIP and has exercised air quality primacy since 1974. *See* 40 C.F.R. § 52.2620. The Wyoming Department of Environmental Quality ensures compliance with the Clean Air Act and state air quality standards, including the regulation of oil and gas development. *See, e.g.* Wyo. Stat. Ann. §§ 35-11-109, -110, -201, -801; *Rules, Wyo. Dep't of Envtl. Quality, Air Quality,* ch. 6.

## BLM'S "WASTE PREVENTION" RULES

### A. BLM's Now-Vacated 2016 Rule

45.     In, 2016 BLM promulgated a rule using its statutory authority to reduce the waste of federal mineral interests for decreasing methane emissions from oil and gas exploration and development activities.  *Waste Prevention, Production Subject to Royalties, and Resource Conservation*, 81 Fed. Reg. 83,008 (Nov. 18, 2016) ("2016 Rule").  The 2016 Rule was challenged by Wyoming, Montana, North Dakota, and Texas in the U.S. District Court for the District of Wyoming for exceeding BLM's statutory authority.

46.     On October 8, 2020, the Wyoming District Court largely agreed with the States and vacated the challenged portions of the 2016 Rule.  *Wyoming, et al. v. U.S. Dep't of Interior*, 493 F.Supp.3d 1046 (D. Wyo., 2020), *appeal filed* (10th Cir. No. 20-8073).

47.     The Wyoming District Court determined that the 2016 Rule was unlawful for a multitude of reasons, including:

a.  The 2016 Rule exceeded BLM's statutory authority under the MLA and FOGRMA.  *Wyoming*, 493 F.Supp.3d at 1084-1086.

b.  The 2016 Rule conflicted with the cooperative Federalism framework established under the Clean Air Act, which gives EPA and the States comprehensive authorities to regulate methane emissions.  *Id.* at 1065-1066.

c.  The 2016 Rule imposed a preference for flaring (i.e., combusting) methane emissions over venting methane emissions, evidencing that the 2016 Rule's thinly veiled purpose was reducing greenhouse gas emissions rather than reducing the waste of federally owned minerals.  *Id.* at 1068.

d.   The 2016 Rule conflicted with and imposed more stringent methane emission restrictions on oil and gas operations than did EPA's regulations for such operations, requiring states to seek variances from the 2016 Rule even when in compliance with EPA's regulations.  *Id.* at 1065-1066.

e.   The 2016 Rule's imposition of emission standards on private and State mineral interests that were subject to communitization agreements with federal mineral interests was both unlawful and arbitrary and capricious.  *Id.* at 1081-1085.

f.    The 2016 Rule's cost-benefit analysis revealed that the majority of the benefits ascribed to the 2016 Rule were based on purported air quality benefits rather than economic benefits tied to increased royalties due to decreased waste (the Court also found BLM's reliance on the global "social cost of carbon" to be arbitrary and capricious)*.  *Id.* at 1078-1081.

g.   Certain technical elements of the 2016 Rule (including the failure to adequately consider the impact of the rule on marginal wells (*Id.* at 1077); the failure to adequately explain and support the emissions capture requirements (*Id.* at 1078); and the failure to explain BLM's departure from its long-held position that it lacked authority to generally regulate State and private mineral interests in pooled or communitized units (*Id.* at 1084-85) were also arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

48.    In short, because BLM's 2016 Rule was fundamentally an air emissions rule thinly disguised as a waste prevention rule, the challenged portions of the rule were held unlawful, arbitrary and capricious, or both (including BLM's attempt to assert federal regulatory authority

over communitized State and private mineral interests), the court vacated the challenged parts of the 2016 Rule.  *Id.* at 1085-1086.

### B. BLM's Final Rule Challenged in this Action

49.     This Final Rule, which BLM set to become effective on June 9, 2024, contains many of the same fundamental defects that led to the vacatur of the 2016 Rule, but builds upon them by adding in some new ones.

50.     As one fundamental defect, the Final Rule continues to unlawfully focus on air emissions rather than preventing waste, exceeding BLM's statutory authority and violating the cooperative federalism framework of the Clean Air Act.  Notwithstanding BLM paying lip service to addressing this problem of the 2016 Rule (*See* 89 Fed. Reg. at 25,393 (claiming the Final Rule "is not focused on achieving any ancillary effects on air quality or climate change")), the Final Rule's primary focus on regulating greenhouse gases remains apparent.

51.     Just like the 2016 Rule, the Final Rule again mandates a preference for flaring over venting. *See* 89 Fed. Reg. at 25,393, 25,428 (§ 3179.50(a) ("The operator must flare, rather than vent, any gas that is not captured.")).   However, "[f]or waste minimization and resource conservation purposes, no difference exists between eliminating excess methane by venting it or flaring it – the same amount is wasted in either event." *Wyoming*, 493 F.Supp.3d at 1068.  There is a difference between them for putative climate change purposes though, as "the Rule's venting prohibition prioritizes global climate change over regional ozone control, without changing the amount of natural gas that is wasted." *Id.*

52.     Continuing the errors of the 2016 Rule, the Final Rule also frequently discusses climate change benefits, including the social cost of greenhouse gases, despite claiming that Final Rule is justified solely on waste prevention.  *See e.g.* 89 Fed. Reg. at 25,382, 25,392.

53.     Despite trying to change its justifications around the margins and be more careful with its language this time, the Final Rule is still clearly an attempt by BLM to use rulemaking authority given to it for the purpose of reducing the waste of federally owned minerals to promulgate a rule with the primary goal and design of regulating greenhouse gases.  Courts are "not required to exhibit a naiveté from which ordinary citizens are free."  *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2575 (2019) (citation omitted).

54.     As another fundamental defect, the Final Rule once again asserts BLM regulatory authority over "operations on non-Federal lands where Federal oil and gas is produced under a unit or communitization agreement (CA)." 89 Fed. Reg. at 25,383.  BLM does not make any serious effort to explain how they attempted to address the *Wyoming* court's vacatur of the 2016 Rule for doing the very same thing, instead simply stating that BLM's "authority to regulate the waste of Federal oil and gas is not limited to operations that occur on Federal lands" and referencing Section 226(m) of the MLA—which authorizes communitization agreements but which also requires "the consent of the lessees involved" in those agreements.  *Id.*

55.     BLM's brazenness in re-promulgating part of a rule that was vacated for exceeding its statutory authority without bothering to address or distinguish from that vacatur (and without any change in statutory authority) is noteworthy and remarkable.

56.     Also, as with the 2016 Rule, the Final Rule continues to run roughshod over Plaintiff States' sovereign interests in administering their distinct regulatory programs governing oil and gas production and air quality, imposing a federal program that conflicts and is inconsistent with (by being in parts duplicative, less stringent, and more stringent than) the comprehensive regulatory programs that the States have developed in conjunction with the EPA, and creating confusion in the administration of oil and gas capture and waste prevention requirements in

Plaintiff States.  *See* Attachment C, Comments of the Industrial Commission of North Dakota, BLM-2022-003-3270 (Jan. 30, 2023) at 4-6 (discussing inconsistent variance, leak detection and repair, and initial production testing, and application for permit to drill ("APD") requirements); *see also* Comments of the Wyoming Oil and Gas Conservation Commission, BLM-2022-003-3270, at 13 (Jan. 30, 2023) (discussing the duplicative nature of BLM's proposal with existing State and EPA requirements).

57.     The Final Rule also includes new burdensome technical requirements under an assumption that State regulations are not sufficient to curtail the waste of federally owned minerals—entirely ignoring contrary comments in the administrative record.  Many of those new requirements are based on glaring factual inaccuracies.

58.     For example, BLM relied on Energy Information Administration ("EIA") data from 2017 through 2022 to conclude that North Dakota accounted for approximately 33 percent of the volume of gas flared nationwide while producing 11 percent of the volume of oil produced, using data to justify many of the Final Rule's restrictions on flaring, gas capture, and Leak Detection and Repair.  89 Fed. Reg. at 25,411.  However, in making that claim, BLM ignored comments submitted by North Dakota demonstrating the EIA data was based on a flawed methodology and that the State's gas capture regulations significantly changed from 2014 to 2022, with gas capture rates increasing from 64% in 2015 to 95% in 2022.  Attachment C, Comments of the Industrial Commission of North Dakota, at 4.

59.     The Final Rule also imposes new requirements for operators to prepare "waste minimization plans" prior to receiving an APD that largely duplicate North Dakota's own gas capture plans and frustrate North Dakota's own 1-year permits by delaying permit processing where conflicting information is required between federal and state permit applications.   89 Fed.

Reg. at 25,426 (Section 3162.3-1); *see also* Attachment C, Comments of the Industrial Commission of North Dakota, at 6.

60.     For its cost-benefit analysis, the Final Rule attempts to justify and obscure the costs of the Final Rule incurred by oil and gas producers by referring to putative benefits that mineral interest holders will gain as increased royalty payments from the decreased "waste." 89 Fed. Reg. at 25,392.  However, any minimal gains from the Final Rule will be far exceeded by the costs the Final Rule imposes on oil and gas production.  *Id.*

61.     As one major problem with its cost-benefit analysis, EPA's calculation of increased royalty payment "benefits" attributable to this Final Rule fails to account for the fact that implementing the Rule is likely to result in decreased production, and thus *decreased* royalty payments to the mineral interest holders.   North Dakota, for example, informed EPA that the Rule will result in the State *losing* millions of dollars in revenue per year from decreased production and decreased royalties and extraction taxes.  *See* Attachment C, Comments of the Industrial Commission of North Dakota, BLM-2022-003-3270, at 2.  But the Final Rule fails to meaningfully address that fact when it asserts that its mandated decreases in venting and flaring will necessarily increase royalty payments for mineral interest owners.

62.     Moreover, BLM's Final Regulatory Impact Analysis ("RIA") includes as a "benefit" production from the estates of private and state mineral owners—which are outside BLM's statutory purview for preventing the waste of *federal* mineral interests.  *See* Regulatory Impact Analysis for: Revisions to 43 CFR 3160 (Onshore Oil and Gas Operations), Addition of 43 CFR 3179 (Waste Prevention and Resource Conservation), BLM-2022-0003-3331 at 6.

## INJURY TO PLAINTIFF STATES DUE TO THE FINAL RULE

63.     The MLA recognizes States' sovereign authority over their natural resources, and directs that "[n]othing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have."  30 U.S.C. § 189.

64.     The Final Rule interferes with Plaintiff States' sovereign authority to regulate, manage, and develop their natural resources, including mineral interests owned by States and private parties.  *See Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 174 (2001) ("States have a constitutional right to maintain their "traditional and primary power over land and water use.")

65.     Plaintiff States also have significant economic interests that are adversely impacted by the Final Rule.

    a.   North Dakota collected $1,494,531,005 in oil and gas production taxes and $1,202,104,198 in oil and gas extraction taxes in 2022, and $1,634,144,485 in oil and gas production taxes and $1,502,726,167 in oil and gas extraction taxes in 2023. *Biennial Report 56th Edition,* 2023, North Dakota Office of the State Tax Commissioner at 11; 16-17.[2]  The additional regulatory requirements imposed by the Final Rule will substantially reduce both the royalties paid to mineral owners in North Dakota (including the State as a mineral owner) and the taxes paid to the State from those mineral royalties.  North Dakota has estimated that the Final Rule will result in an anticipated loss of approximately $38 million per year in state revenue from decreased royalties and extraction taxes.

---

[2] Available at https://www.tax.nd.gov/sites/www/files/documents/news-center/publications/56th-biennial-report.pdf.

b.  Montana collected approximately $110,677,519 in oil and gas taxes in FY2022. The additional regulatory requirements imposed by the Final Rule will substantially reduce both the royalties paid to mineral owners in Montana (including the State as a mineral owner) and the taxes paid to the State from those mineral royalties. *Biennial Report 2020-2022*, 2023, Montana Department of Revenue at 160.[3]

c.  Texas annually collects billions of dollars in oil and gas production taxes. The additional regulatory requirements imposed by the Final Rule will substantially reduce both the royalties paid to mineral owners in Texas (including the State as a mineral owner) and the taxes paid to the State from those mineral royalties.

d.  Wyoming similarly relies on revenue from its oil and gas industry to fund schools, roads, and local governments. The State collected hundreds of millions of dollars from oil and gas production severance taxes in 2023. *See July 2023 Revenue Update*, Consensus Revenue Estimating Group at 13 (July 28, 2023) (table providing actual severance collections in from the first six months of 2023).[4] The Final Rule will have similar adverse economic effects on Wyoming. *See* Comments of the Wyoming Oil and Gas Conservation Commission, BLM-2022-003-3270, at 2 (Jan. 30, 2023).

---

[3]  Available at https://mtrevenue.gov/wp-content/uploads/dlm_uploads/2023/01/2020-2022-Biennial-Report.pdf
[4]  Available at http://eadiv.state.wy.us/creg/Revenue_Update_July2023.pdf.

**CLAIMS FOR RELIEF**

**COUNT 1**
**The Final Rule Exceeds BLM's Authority Under the Mineral Leasing Act**
**(30 U.S.C. § 180 *et seq.*)**

66.    Plaintiff States reassert and incorporate by reference all preceding paragraphs.

67.    BLM claims that it has authority to promulgate the final rule under the MLA and other authorizing statutes.  89 Fed. Reg. at 25,382.

68.    Under the MLA, BLM has authority to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of the [MLA]," 30 U.S.C. § 189, which are "to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise." *Wyoming*, 493 F.Supp.3d at 1062 (citation omitted).

69.    The MLA grants BLM the authority to prevent and mitigate the waste of federally owned natural resources, but it does not grant BLM the authority to promulgate regulations "primarily intended to benefit the environment and improve air quality." *Wyoming*, 493 F.Supp.3d at 1074.  Nor is the MLA "a grant of general regulatory authority over the State and private mineral interests in the communitized units." *Id.* at 1082.

70.    Because the Final Rule is aimed primarily at regulating air emissions and because it asserts regulatory authority over the development of the State and private mineral interests, the Final Rule exceeds BLM's statutory authority under the MLA.

**COUNT II**
**The Final Rule Exceeds BLM's Authority Under Federal Oil and Gas Royalty**
**Management Act**
**(30 U.S.C. § 1751 *et seq.*)**

71.    Plaintiff States reassert and incorporate by reference all preceding paragraphs.

72.    BLM claims that it has authority to promulgate the final rule under the MLA, FOGRMA, and other authorizing statutes.  89 Fed. Reg. at 25,382.

73.    Because the Final Rule is aimed primarily at regulating air emissions and because it asserts regulatory authority over the development of the State and private mineral interests, the Final Rule exceeds BLM's statutory authority under FOGRMA.

## COUNT III
### The Final Rule Violates the Clean Air Act
### (42 U.S.C. § 7401 *et seq.*)

74.    Plaintiff States reassert and incorporate by reference all preceding paragraphs.

75.    Federal agencies "may not exercise [their] authority 'in a manner that is inconsistent with administrative structure that Congress enacted into law.'" *Wyoming*, 493 F.Supp.3d at 1064 (quoting *Food and Drug Admin. V. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000)). And through the Clean Air Act, "Congress directly addressed the issue of air pollution and created a *comprehensive* scheme for its prevention and control." *Id*.

76.    BLM's attempt to impose comprehensive air emission regulations on oil and gas operations through this Final Rule violates the Clean Air Act, which reserves the control of air emissions to the cooperative federalism framework jointly administered by EPA and the States.

77.    Because the Final Rule "upends the [Clean Air Act's] cooperative federalism framework and usurps the authority to regulate air emissions Congress expressly delegated to the EPA and States," *Wyoming*, 493 F.Supp.3d at 1065, it is unlawful.

## Count IV
### The Final Rule Violates the Federal Land Policy and Management Act
### (43 U.S.C. § 1701 *et seq.*)

78.    Plaintiff States reassert and incorporate by reference all preceding paragraphs.

79.    In accordance with the FLPMA, the development of federal and Indian mineral interests in Plaintiff States is governed by the Natural Resources Management Plans for Plaintiff

24

States, which are binding on BLM until they are amended though the public notice and comment process. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004).

80.     The Final Rule is inconsistent with Plaintiffs' Natural Resources Management Plans by, among other things, asserting federal regulatory authority over State and private minerals that are pooled with federal minerals through communitization agreements. *Contra, e.g.*, North Dakota Resource Management Plan and Environmental Impact Statement (July 1987) at 164 ("In the case of split estate the stipulations do no dictate surface management on private lands but are only intended to provide required protection of important resources that otherwise may be impacted by federal actions.").

81.     BLM's failure to amend Plaintiffs' Resources Management Plans to account for the Final Rule violates the FLPMA, rendering the Final Rule unlawful.

### COUNT V:
### The Final Rule is Arbitrary and Capricious
### (5 U.S.C. § 706)

82.     Plaintiff States reassert and incorporate by reference all preceding paragraphs.

83.     The APA requires courts to hold unlawful and set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law (5 U.S.C. § 706(2)(A)), or that are in excess of statutory jurisdiction, authority, or limitation, or short of statutory right, *id.* § 706(2)(C).

84.     In addition to being in excess of BLM's statutory authorities under the MLA and FOGRMA, and being in conflict with the statutory frameworks established by the Clean Air Act and FLPMA, the Final Rule is unlawful and arbitrary and capricious for several reasons.

85.     *First,* the Final Rule is arbitrary and capricious because BLM's cost-benefit analysis confirms the Final Rule is not cost justified and is out-of-step with anything that could be

considered reasoned decision making, including calculating benefits by including State and private mineral resources outside of BLM's jurisdiction in its costs benefit analysis.

86.     BLM acknowledges that the Final Rule would cost operators $19.3 million per year while only generating benefits to operators of $1.8 million per year.  89 Fed. Reg. at 25,392.  While BLM attempts to justify those costs by estimating that the Final Rule will generate $51 million in increased royalties for mineral interest holders (which the Final RIA notes are transfers not appropriate for inclusion in a cost benefit analysis (Regulatory Impact Analysis for: Revisions to 43 CFR 3160 (Onshore Oil and Gas Operations), Addition of 43 CFR 3179 (Waste Prevention and Resource Conservation), BLM-2022-0003-3331 at 7; 11.)), BLM fails to account for the likely decrease in royalties due to shut-in or curtailment of current production in response to the Final Rule's new venting/flaring restrictions and other requirements. *Id.*

87.     *Second,* the Final Rule is arbitrary and capricious because it reverses, without adequately explaining, BLM's long-standing position that it has limited authority over State and private mineral interests that have been pooled with federal mineral interests, simply asserting for the first time (since the last time the same assertion was rejected) full regulatory authority over such non-federal interests.

88.     For over four decades, BLM has recognized that its authority in pooled (communitized) arrangements is limited to rates of development and production for purposes of avoiding the "waste" of Federal mineral interests, similar to the rights of any participant in communitized arrangements (subject to leaseholder consent), and is not a grant of general regulatory authority over the State and private mineral interests in the communitized units.  Yet now, BLM claims in the Final Rule the ability to impose significant restrictions on private and State interests in communitized units without regard to leaseholder consent.  "A significant change

26

in an agency's interpretation of its statutory authority deserves a reasoned explanation, which is lacking here." *Wyoming*, 493 F.Supp.3d at 1074; *accord, e.g., Republic Airline Inc. v. Dep't of Transp.*, 669 F.3d 296, 299 (D.C. Cir. 2012) ("One of the core tenets of reasoned decision-making is that 'an agency [when] changing its course… is obligated to supply a reasoned analysis for the change.") (quoting *Motor Vehicle Mfrs. Ass'n v State Farm*, 463 U.S. 29, 42 (1983)).

89.     *Third*, the Final Rule is arbitrary and capricious because it fails to consider the significant reliance interests Plaintiff States have invested in BLM continuing to interpret its authority to prevent the waste of federally owned mineral as it has done for decades. *Cf. DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'") (cleaned up) (citation omitted).

90.     *Fourth*, the Final Rule is arbitrary and capricious because BLM failed to comply with the notice and public comment provisions of the APA, 5 U.S.C. 701 *et seq.*, by failing to properly take into account and respond to comments on the proposed rule, including, but not limited to, Plaintiff States' comments. *See e.g.* Attachment C, Comments of the Industrial Commission of North Dakota, at 2 (discussing how imposition of the Rule would result in decreased production); *id*. at 4 (discussing North Dakota's actual gas capture rates in 2022, which were ignored by BLM in justifying its gas capture requirements); *id*. at 6 (noting duplication issues with BLM's waste minimization plan requirements for applications for permits to drill that were not addressed in the Final Rule); *id.* at 6-8 (noting BLM has failed to explain its change in jurisdictional stance over state and private mineral interests). BLM's failure to meaningfully respond to such objections renders the Rule arbitrary and capricious. *See Sierra Club v. Salazar,*

177 F.Supp.3d 512, 532 (D.C. Cir. 2016) (agency acts arbitrary and capriciously when "it fails to 'respond <u>meaningfully</u> to objections raised by a party.'") (citation omitted, emphasis original).

91.     *Fifth,* as evidenced by its many other legal infirmities, the Final Rule is arbitrary and capricious because BLM's expressed justification of "waste prevention" is pretextual. Nothing has fundamentally changed from the vacated 2016 Rule, and BLM is continuing to use rulemaking authority given to it for the purpose of protecting against the waste of federally-owned minerals for the purpose of regulating greenhouse gas emissions for putative climate change reasons. *Cf. Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2575 (2019) ("[T]he evidence tells a story that does not match the explanation the Secretary gave for his decision. … [courts] are not required to exhibit a naiveté from which ordinary citizens are free.")  (citation omitted).

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

92.     WHEREFORE the Plaintiff States respectfully requests that this Court:

    a.   Issue a Declaratory Judgement that the Final Rule is unlawful;

    b.   Vacate the Final Rule;

    c.   Enter other preliminary or permanent injunctive relief as Plaintiff States may hereafter specifically seek; and

    d.   Grant Plaintiff States such additional relief as the Court deems just and proper to remedy the Defendants' violations of law and to protect Plaintiff States' sovereign interests.

Dated: April 24, 2024

DREW H. WRIGLEY
Attorney General

/s/ Paul M. Seby

PAUL M. SEBY
Special Assistant Attorney General
Greenberg Traurig, LLP
1144 15th St, Suite 3300
Denver, CO 80202
Phone: (303) 572-6584
Email: sebyp@gtlaw.com

PHILIP AXT
Solicitor General
600 E. Boulevard Ave., Dept. 125
Bismarck ND 58505
Phone: (701) 328-2595
Email: pjaxt@nd.gov

*Counsel for State of North Dakota*

AUSTIN KNUDSEN
Attorney General

/s/ Christian B. Corrigan
CHRISTIAN B. CORRIGAN
Solicitor General
Montana Department of Justice
215 N. Sanders Helena, MT 59601
Christian.Corrigan@mt.gov

*Counsel for State of Montana*

KEN PAXTON
Attorney General

/s/ Christopher Lee Lindsey
CHRISTOPHER LEE LINDSEY
Assistant Attorney General
P.O. Box 12584, Capital Station
Austin, Texas 78711
Phone: (512) 463-2157
Christopher.Linsey@oag.texas.gov

*Counsel for State of Texas*

BRIDGET HILL
Attorney General

/s/ Travis Jordan (with permission)
TRAVIS JORDAN
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
travis.jordan@wyo.gov

*Counsel for State of Wyoming*