# ATTACHMENT C

**Comments of the Industrial Commission of North Dakota BLM-2022-003-3270 (Jan. 30, 2023)**



# INDUSTRIAL COMMISSION OF NORTH DAKOTA

| Doug Burgum | Drew H. Wrigley | Doug Goehring |
|:---:|:---:|:---:|
| Governor | Attorney General | Agriculture Commissioner |

January 30, 2023

**SUBMITTED ONLINE VIA https://www.regulations.gov/; Docket ID No. BLM-2022-0003-0001**

TRACY STONE-MANNING

Director

LAURA DANIEL-DAVIS

Principal Deputy Assistant Secretary, Land and Minerals Management

LONNY BAGLEY

Acting Division Chief, Fluid Minerals Division

U.S. Department of the Interior

Director (630), Bureau of Land Management

1849 C St. NW, Room 564,

Washington, DC 20240

Attention: 1004–AE79.

Re:   State of North Dakota – North Dakota Industrial Commission - Comments on Proposed Rule: *Waste Prevention, Production Subject to Royalties, and Resource Conservation*, RIN 1004-AE79

Dear Director Stone-Manning, Principal Deputy Assistant Secretary Daniel-Davis, and Acting Division Chief Bagley:

On November 30, 2022, the Bureau of Land Management ("BLM") announced the proposed rule entitled "*Waste Prevention, Production Subject to Royalties, and Resource Conservation*" (87 Fed. Reg. 73588) (hereinafter the "2023 Venting and Flaring Proposal").

The State of North Dakota ("North Dakota" or the "State"), by and through the North Dakota Industrial Commission ("NDIC")[1] respectfully submits these comments in response to the proposed 2023 Venting and Flaring Proposal. For the reasons stated herein, the State of North Dakota requests the Agencies to withdraw the 2023 Venting and Flaring Proposal in its entirety.

If the BLM does not withdraw the 2023 Venting and Flaring Proposal in its entirety, the BLM should then substantially rework and revise the 2023 Venting and Flaring Proposal to be much more in line with the requirements of the Mineral Leasing Act ("MLA"), the Federal Oil and Gas Royalty Management Act ("FOGRMA"), the Inflation Reduction Act of 2022 ("IRA"), and the prior federal district court decision in *Wyoming v. U.S. Dept. of the Interior*, 493 F. Supp. 3d 1046, 1052–1057 (D. Wyo. 2020), which held substantially similar provisions in the 2016 Venting and Flaring Rule (81 Fed. Reg. 83008 (Nov. 18, 2016)) were unlawful.

Further, any final rule should be consistent with the U.S. Constitution, not impede upon the statutory cooperative federalism framework of the Clean Air Act ("CAA"), and U.S. Supreme Court precedent and reflect the cooperative federalism framework established by Congress in the MLA and CAA by affirming that the regulatory authority over State and local mineral resources resides with North Dakota.

## I. North Dakota's Interest in the 2023 Venting and Flaring Proposal and Commitment to Regulating Waste in the State.

North Dakota has partnered with the BLM for decades to meet the challenge of properly regulating mineral waste in the state, whether under Federal or State jurisdiction. North Dakota is blessed with tremendous natural resources that are of great importance to its citizens and that benefit the entire country. North Dakota is proud of its strong record of responsibly protecting and developing its own natural resources for the benefit of its citizens and the nation, as well as those who visit our beautiful State. North Dakota agrees with the Administration's emphasis on using resources wisely and efficiently.

The State of North Dakota is ranked 3rd in the United States among all states in the production of oil and gas. North Dakota produces more than 400 million barrels of oil per year and 1 trillion cubic feet of natural gas per year. Implementation of this rule will result in an anticipated loss in state revenue value from royalties and taxes estimated to be $112 million per year. The impact from this loss is expected to last through the entire 30-year development life of the Bakken. North Dakota's revenues, from the gross production tax and oil extraction tax, fund various programs through a series of 12 funds that each must reach a maximum before funds can be appropriated to the next fund in this series.

Even a brief revenue delay can result in a high priority fund not reaching the maximum appropriation with lower priority funds consequently receiving no revenue for the particular biennium. This forces a reprioritization and fund transfers in future bienniums that can take decades to correct. This occurred in 1987-2004 when low oil prices generated only enough revenue to partially fund appropriations to counties and to water resource projects, the top 2 out of 12 priorities, for 17 years.

Under the current revenue distribution structure, the impact would be to eliminate revenue of which approximately 30% is earmarked for education, 10% for natural resource (water) projects, 10% for Health and Human Services (Aging Services, Behavioral Health, Child Support & Family Services, Developmental Disability Services, and State Hospital), 7% to counties and 7% to cities, 5% infrastructure, 30% to legacy fund for education, resources, and human services support of future generations, and 1% other.

---

[1] The Industrial Commission of North Dakota consists of the Governor, Attorney General, and the Agriculture Commissioner and is tasked with managing industries on behalf of the State.

The NDIC, Department of Mineral Resources, Oil and Gas Division maintains jurisdiction to administer North Dakota's comprehensive oil and gas regulations within North Dakota Administrative Code ("NDAC") Chapter 43-02-03. These regulations include regulation of the drilling, producing, and plugging of wells; the restoration of drilling and production sites; the perforating and chemical treatment of wells, including hydraulic fracturing; the spacing of wells; operations to increase ultimate recovery such as cycling of gas, the maintenance of pressure, and the introduction of gas, water, or other substances into producing formations; disposal of saltwater and oil field wastes through the ND UIC Program; and all other operations for the production of oil or gas.

### A. North Dakota's Unique Split-Estate Land Ownership

Mineral ownership of North Dakota lands upon which oil and gas development has occurred consists of approximately 85% private lands, 9% federal lands, and 6% state lands. Many of the private lands in North Dakota upon which oil and gas development has occurred are split estate lands, with more than 30% of the potential development on private surface involving federal minerals and therefore subject to the proposed rule.

North Dakota has a unique history of land ownership that has resulted in a significant portion of the state consisting of split estate lands that could be adversely affected by the proposed rule. Unlike many western states that contain large blocks of unified federal surface and federal mineral ownership, the surface and mineral estates in North Dakota were at one time more than 97% private and state-owned as a result of the railroad and homestead acts of the late 1800s. However, during the depression and drought years of the 1930s, numerous small tracts in North Dakota went through foreclosure.

The federal government, through the Federal Land Bank and the Bankhead Jones Act, foreclosed on many farms taking ownership of both the mineral and surface estates. Many of the surface estates were later sold to private parties with some or all of the mineral estates retained by the federal government. This resulted in a very large number of small federally-owned mineral estate tracts scattered throughout western North Dakota. Those federal mineral estates impact more than 30% of the oil and gas spacing units that are typically recognized as a communitized area ("CA") by the BLM.

There are a few large blocks of federal mineral ownership, for which the federal government has trust responsibility and also manages the surface estate through the U.S. Forest Service or Bureau of Indian Affairs. These federal blocks are on the Dakota Prairie Grasslands in southern McKenzie County and northern Billings County as well as on the Fort Berthold Indian Reservation. Even within those areas, federal mineral ownership is interspersed with a "checkerboard" of private and state mineral or surface ownership. Therefore, virtually all federal management of North Dakota's oil and gas producing region consists of some form of split estate.

### B. North Dakota's Long Participation in the BLM's Venting and Flaring Rulemakings.

North Dakota is looking forward to continuing constructive engagement with the BLM to develop a Venting and Flaring rule that is practical and recognizes the importance and value of State jurisdiction regulating the waste of state mineral resources. North Dakota has commented at each stage of the BLM's prior rulemaking efforts to update regulations governing venting, flaring, and royalty-free use of gas as previously contained in the 1979 Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases, Royalty or Compensation for Oil and Gas Lost ("NTL-4A"): *See* **Exhibit 1** hereto, North Dakota Industrial Commission comments on the 2016 Venting and Flaring Rule; **Exhibit 2** hereto, North Dakota Industrial Commission comments

the 2018 proposal to revise the 2016 Venting and Flaring Rule. North Dakota respectfully renews and incorporates many of the same issues it made previously into these comments, as further detailed herein.

North Dakota also participated extensively in the litigation regarding the legality of the 2016 Venting and Flaring Rule. *See Wyoming et al. v. Jewell et al.,* Civil No. 2:16-cv-0285 (D.Wyo. 2016). In this litigation, North Dakota successfully obtained a vacatur of the prior 2016 Venting and Flaring Rule. *See Wyoming v. U.S. Dept. of the Interior*, 493 F. Supp. 3d 1046 (D. Wyo. 2020).

North Dakota's extensive involvement in venting and flaring rulemakings (and judicial review thereof) demonstrates the State's commitment to regulating mineral waste in the state while preserving regulatory control over its own sovereign mineral resources. North Dakota has long supported a Venting and Flaring Rule that properly conforms to the jurisdictional limitations of the U.S. Constitution, the MLA, FOGRMA, and the CAA, and recognizes the State's major role under cooperative federalism for regulating the waste of State resources.

## II. North Dakota Industrial Commission Comments On The 2023 Venting And Flaring Proposal.

**Addressing claims that North Dakota is not adequately meeting flaring/capture requirements. See 87 Fed. Reg at 73599:**

> "The BLM notes that in 2019—when NDIC Order 24655 ostensibly imposed an 88 percent capture requirement on operators—19 percent of total natural gas production in North Dakota was flared.86"

North Dakota's gas capture regulations have resulted in gas capture rates increasing from 64% in 2014 to total capture of 95% in 2022 even with all approved variances included.

In its proposed rule publication, the BLM disingenuously criticizes North Dakota's gas capture regulations for allowing variances, and then inconsistently proposes a rule that considers associated natural gas as unavoidably lost under the same circumstances as 9 out of 10 NDIC variance allowances, specifically:

1) Well drilling;

2) Well completion and related operations, subject to the limitations in § 3179.102 = NDIC variance 1;

3) Initial production tests, subject to the limitations in § 3179.103 = NDIC variance 1;

4) Subsequent well tests, subject to the limitations in § 3179.104 = NDIC variance 2;

5) Exploratory coalbed methane well dewatering;

6) Emergency situations, subject to the limitations in § 3179.105 = NDIC variance 7a;

7) Normal operating losses from a natural-gas-activated pneumatic controller or pump;

8) Normal operating losses from a storage vessel or other low-pressure production vessel that is In compliance with § 3179.203 and § 3174.5(b);

9) Well venting in the course of downhole well maintenance and/or liquids unloading performed

In compliance with § 3179.204 = NDIC variance 7b;

10) Leaks, when the operator has complied with the leak detection and repair requirements in §§ 3179.301 and 302;

(11) Facility and pipeline maintenance, such as when an operator must blow-down and Depressurize equipment to perform maintenance or repairs = NDIC variance 3 and 4;

(12) Pipeline capacity constraints, midstream processing failures, or other similar events that Prevent oil-well gas from being transported through the connected pipeline, subject to the limitations in § 3179.8 = NDIC variance 5;

(13) Flaring of gas from which at least 50 percent of natural gas liquids have been removed and Captured for market, if the operator has notified the BLM through a Sundry Notices and Report on Wells, Form 3160–5 (Sundry Notice) that the operator is conducting such capture and the inlet of the Equipment used to remove the natural gas liquids will be an FMP = NDIC variance 10; and

(14) Flaring of gas from a well that is not connected to a gas pipeline, to the extent that such flaring was Authorized by the BLM in the approval of the Application for Permit to Drill = NDIC variance 6.

**LDAR Requirements**:  The 2022 VF Rule returns to many of the same 2016 VF Rule LDAR requirements (while claiming they are less restrictive on marginal wells).  Of note, the BLM claims that state flaring programs are <u>not</u> sufficient to curtail waste, and specifically attacks North Dakota's program:

> "For example, the BLM's review of State regulations revealed that North Dakota's flaring rules were modified in recent years in a manner allowing for more flaring within the State's gas-capture-percentage requirements. Operators in the Bakken, Bakken/ThreeForks, and Three Forks pools are currently subject to a 91 percent gas capture requirement under North Dakota Industrial Commission (NDIC) Order 24655. However, the NDIC's current Policy/Guidance85 for Order 24655 identifies a number of circumstances under which flared volumes will not be counted against the operator's capture percentage. These circumstances (referred to as "variances" by the NDIC) include flaring due to "force majeure" events, flaring due to new wells being connected to the same gas infrastructure system, and right-of-way delays. Thus, it appears that many flaring events that are rooted in inadequate gas-capture infrastructure will not count against an operator's gas-capture percentage under NDIC Order 24655. The BLM notes that in 2019—when NDIC Order 24655 ostensibly imposed an 88 percent capture requirement on operators—19 percent of total natural gas production in North Dakota was flared.86 North Dakota is a major source of Federal oil and gas production, producing approximately 89 Bcf of Federal gas and 45 million barrels of Federal oil in 2019.

**Flaring Provisions**:  The 2022 VF Rule again proposes mcf/month flaring limits, similar to the 2016 Rule (although reduced from 1,800 mcf/month to 1,050 mcf/month).  North Dakota previously commented on the 2016 Rule that this threshold should not be based on hard MCF limits but instead based on average percentage of gas captured to ensure economic viability, better manage unconventional resources, and minimize conflict with ND's flaring regulations.

The 2022 VF Rule also requires a meter for any flare at a rate of 1,050 mcf/month or higher (citing to 43 CFR 3175). ND previously commented that it was not aware of a meter system that could accurately measure flare gas volumes over the extreme volume and pressure ranges in the Bakken. The meter requirement in this proposed rule conflicts with that prior comment/understanding.

**Initial Production Testing:** The 2022 VF Rule imposes the same 20k mcf/30 day period as the 2016 VF rule. North Dakota previously commented that this limit conflicts with NDIC Order No. 24665 which allows well to produce more than 20MMcf in the 14 days of unrestricted production, and recommended this limit be changed to a total time period instead of total volumetric amount.

**APDs**: The 2022 VF Rule includes a requirement that APDs include a plan to minimize waste of natural gas, and that the BLM "may deny an Application for Permit to Drill if the operator fails to submit a complete and adequate waste minimization plan." This requirement likely duplicates North Dakota's own gas capture plans, and will delay or cause North Dakota 1 year permits to expire if conflicting information is required by both the 2022 VF Rule and North Dakota requirements, resulting in the BLM erroneously denying or disapproving APDs.

### III. North Dakota's Comments on the Legal Aspects of the 2023 Venting and Flaring Proposal.

The Agencies propose to arbitrarily and capriciously replace the BLM's current requirements governing venting and flaring, the NTL–4A. The 2023 Venting and Flaring Proposal is an unlawful jurisdictional overreach inconsistent with the Congressional limitations of the MLA, FOGRMA, and CAA, as well as the recent federal court decision in *Wyoming v. U.S. Dept. of the Interior*, 493 F. Supp. 3d 1046 (D. Wyo. 2020). As such, the 2023 Venting and Flaring Proposal should be withdrawn in its entirety, or in the alternative, substantially reworked to fully address the legal insufficiencies identified herein.

#### A. The 2023 Venting And Flaring Proposal Is An Unlawful Federal Jurisdictional Overreach Into Regulation Of State And Private Mineral Resources In Violation Of The BLM's Lawful Authority.

Given North Dakota's unique split-estate land ownership situation, the 2023 Venting and Flaring Proposal would have far-reaching unlawful and adverse impacts on North Dakota's ability to administer its oil and gas regulatory program. This is reflected in the 2023 Venting and Flaring Proposal's assertion of jurisdiction over State and private minerals which are communized with federal minerals, which states:

> The BLM's authority to regulate the waste of Federal oil and gas is not limited to operations that occur on Federal lands, but also extends to operations on non-Federal lands where Federal oil and gas is produced under a unit or communitization agreement (CA).

87 Fed. Reg. at 73592. This statement is directly contrary to the BLM's longstanding interpretation of its own authority over State and private minerals communitized with federal and Indian minerals under a CA agreement, and is directly contradictory to the Court's decision in *Wyoming v. U.S. Dept. of the Interior*, 493 F. Supp. 3d 1046 (D. Wyo. 2020).

In *Wyoming,* the Court found that prior to the BLM's promulgation of the 2016 Venting and Flaring Rule, the BLM had long "recognized its limited authority over oil and gas operations on non-Federal lands." *Id.* at 1084. More specifically the Court found:

> Accordingly, the BLM's authority in pooled arrangements is limited to rates of development and production for purposes of avoiding the "waste" of Federal mineral interests, similar to the rights of any participant in communitized arrangements, and is not a grant of general regulatory authority over the State and private mineral interests in the communitized units. *See Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1254 (10th Cir. 2014) (the purpose of communitization was not to enable federal control of non-public lands, but rather to address the problem "that mineral deposits don't always follow plat lines," and that uncoordinated development "often yielded frantic, duplicative, and crazy-quilt exploration activities in what amounted to a single oil and gas field").
>  . . .
>
> Without meaningful explanation, the BLM changed its long-held position that it lacked authority to generally regulate State and private mineral interests in pooled or communitized units.
>  . . .
>
> The BLM hardly acknowledges its change of policy, much less explains how the change is "permissible under the statute" or that there are "good reasons" for the change. Moreover, as discussed previously, the BLM's purported justification of preventing waste is belied by the record, and the BLM failed to take into account the facts and circumstances underlying its long-held position that it has only limited regulatory authority over private minerals, even when they have been communitized with Federal minerals. Instead, the BLM now characterizes such intrusion as "incidental" (*see* 81 Fed. Reg. at 83,039), ignoring how its longstanding policy may have "engendered serious reliance interests." Most apparent, North Dakota . . . [has] enacted statutes that either require, or authorize, State and private interests to be pooled or communitized with Federal mineral interests. *See* N.D. CENT. CODE §§ 38-08-07, -08; *Continental Res., Inc. v. Farrar Oil Co*., 559 N.W.2d 841, 845 (N.D. 1997) ("The Commission has power to compulsorily pool all interests in the spacing unit for development and operations."). . . .  Under the Rule's expansion of the BLM's jurisdiction, the implementation of these State pooling statutes effectively results in the forfeiture by private and State mineral interests of their rights and obligations under State law.37 In response, the BLM callously disregarded these serious concerns. See AR at 391 (81 Fed. Reg. at 83,039) ("The fact that States and private parties have chosen to enter into unitization or communitization agreements whereby State or private oil or gas is commingled with Federal or Indian oil or gas, and produced concurrently with Federal or Indian oil or gas, does not deprive the BLM of its authority to impose reasonable waste prevention requirements on operators producing Federal or Indian oil or gas."). However, the BLM cannot leverage its limited authority to manage and collect royalties from the Federal portion of pooled Federal, State and private mineral interests operating under long-standing communitization agreements to impose comprehensive regulations on State and private land and mineral interests, particularly where only a fraction of the benefits claimed by the BLM as supporting the Rule have anything to do with the prevention of waste or increased royalty revenues. See Discussion, supra at B.3. The BLM has given no good reasons for the change in its prior policy limiting those regulations applicable to State and privately-owned mineral interests pooled with Federal mineral interests. Therefore, the BLM's unexplained and unsupported change of policy and resulting effort to exercise jurisdiction over State and private mineral interests is not due any deference and is a violation of the APA.

Just as in the prior 2016 Venting and Flaring Rule, the BLM has again failed to adequately explain or justify its change and jurisdictional overreach into State and private lands subject to CAs. In a

dismissive fashion, the BLM simply claims that the authority to regulate waste from non-Federal lands subject to CAs has always existed, but offers no meaningful or supported explanation for the change in its assertion of jurisdiction over these resources. *See* 87 Fed. Reg. at 73592-73593. Such a substantial change in a longstanding position is both arbitrary and capricious and in violation of the statutory delegation of authority to the BLM in the MLA and FOGRMA.

### B. The 2023 Venting And Flaring Proposal Continues To Unlawfully Focus On Air Emissions Rather Than Waste, Violating The Cooperative Federalism Framework Of The Clean Air Act

The 2023 Venting and Flaring Proposal continues to focus on air emissions rather than the prevention of waste, which is an area of authority reserved to EPA under the CAA. For example, the 2023 Venting and Flaring Proposal continues to codify a preference for flaring over venting. 87 Fed. Reg. at 73601-73602. As the Court noted in *Wyoming*, "[f]or waste minimization and resource conservation purposes, no difference exists between eliminating excess methane by venting it or flaring it – the same amount is wasted in either event." 493 F.Supp.3d at 1068.

Further, the BLM's claims that the preference for flaring comes from "safety" concerns misses the mark. The BLM's authority is to regulate waste prevention, not safety. The 2023 Venting and Flaring Proposal's preference for venting is a proposed air emissions regulation, not a safety regulation.

As an additonal example, the variance provisions of the 2023 Venting and Flaring Proposal exemplify the BLM's focus on air emissions and jurisdictional overreach. The proposal, like the unlawful 2016 Venting and Flaring Rule, requires North Dakota (and other states) to request variances from any proposed regulations, rather than exempting state regulations where they conflict. The presumptive need to seek a variance conflicts with North Dakota's statutory authority and state primacy and sovereign authority in administering its oil and gas regulatory program, and the Clean Air Act's regulatory construct of uniformity and cooperative federalism.

That is because North Dakota already has sufficient regulations governing waste from State and private minerals under its own authority. *See Wyoming,* 494 F.Supp.3d at 1069 ("But instead of automatically accepting those State requirements like the Rule does for the corresponding EPA standards, States must apply for variances from the BLM, which would then give the BLM authority to enforce those State provisions. In these respects, the Rule's promulgation is – when considering the comprehensive scheme enacted by Congress for regulation of air emissions under the CAA – unquestionably 'inconsistent with the administrative structure that Congress enacted into law.'" (citing to *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 125 (2000)).

In short, North Dakota steadfastly maintains its sovereign regulatory authority over State and private mineral resources, even those resources are voluntarily subject to a CA. The BLM may not force air emission regulations under the guise of waste prevention provisions on these minerals, nor require state and private mineral owners to seek variances from those rules.

Similarly, the 2023 Venting and Flaring Proposal's statement that "[u]nder the criteria in section 1 of Executive Order 13132, this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement" is incorrect. 87 Fed. Reg. at 73611. The 2023 Venting and Flaring Proposal imposes direct obligations on State and private minerals that are in violation of the cooperative federalism principles implicated in *Wyoming*, and consequently the BLM was required to undergo a federalism summary impact statement for this rule.

### C. The 2023 Venting And Flaring Proposal Is Not Justified Based On The BLM's Own Cost-Benefit Analysis.

The BLM acknowledges, in the RIA for the 2023 Venting and Flaring Proposal, that the proposed rule will significantly cost operators. The BLM calculates a cost to operators of $122 million a year, while generating benefits of only $54.2 million a year, a net cost of $67.8 million per year. *See* 87 Fed. Reg. at 73599-73600 ("The BLM acknowledges that the costs of this rule to operators will outweigh the benefits in terms of the monetized market value of the gas conserved."). The 2023 Venting and Flaring Proposal remains unjustified, and adopting it would be arbitrary and capricious.

Just as in the *Wyoming* case, the BLM cannot justify its goals of "waste prevention" in the 2023 Venting and Flaring Proposal, and the rule should be withdrawn in its entirety. The BLM admits through its own RIA analysis that the proposed rule costs more than the supposed "waste" it would prevent. As the BLM acknowledges, the 2023 Venting and Flaring Proposal only becomes a net positive when the "social cost of greenhouse gases" is considered as an ancillary benefit. *Id.* at 73600.

However, as the Court in *Wyoming* already held, that the "social cost of greenhouse gases" was not an adequate basis in which to justify the 2016 Venting and Flaring Rule. *Wyoming*, 493 F.Supp.3d at 1078-1079 ("But, taking at face value the BLM's assertion that the Rule aims 'to reduce waste of natural gas,' the cost-benefit analysis should have been considered primarily in terms of waste prevention and not greenhouse gas emissions.")

As such, the Court ultimately concluded that the BLM"s justifications for the 2016 Venting and Flaring Rule were inadequate, and as such the rule was not justified. *Id.* at 1081 ("the BLM failed to adequately explain or support with substantial evidence why it was reasonable to use a global emissions metric to quantify the benefits arising from a rule designed to curb domestic waste under the MLA. It is one thing for ancillary benefits to be part of the calculus but quite another for them to be the fundamental driver of the calculus.").

The same is true here. The BLM has not provided an adequate justification for the waste prevention goals of the 2023 Venting and Flaring Proposal. In fact, the BLM has provided quite the opposite. It has provided a sound justification for <u>not</u> finalizing or adopting the rule, as the proposed waste prevention measures only come at a substantial net cost to operators and thus, in the end, do nothing to actually prevent waste.

### IV. Conclusion.

For the reasons set forth in this comment letter, the State of North Dakota respectfully requests that the BLM withdraw the 2023 Venting and Flaring Proposal in its entirety.

If the BLM does not withdraw the 2023 Venting and Flaring Proposal in its entirety, the BLM should then substantially rework and revise the 2023 Venting and Flaring Proposal to meaningfully and fully address the many legitimate concerns that North Dakota has provided in these comments. Specifically, the BLM must, at a minimum:

1) Apply the requirement for a "waste minimization plan" only to permits to drill for wells that penetrate Federal or Indian minerals.

2) Modify the rule to apply Section 3179.2 only to operations and production equipment

located on a Federal or Indian oil and gas lease, and not to operations on State or private tracts, even where such tracts have been committed to a federally approved unit or CA (sometimes referred to as "mixed-ownership" units or CAs).

3) Apply the proposed flaring volume limits in section 3179.102, 3179.103, 3179.104, 3179.201, 3179.8, 3179.9, only to the federal share of production from "mixed-ownership" units or CAs.

Sincerely,

Doug Burgum
Governor

Drew H. Wrigley
Attorney General

Doug Goehring
Agriculture Commissioner